Leland S. Collins and Serelda W. Collins v. Commissioner.
Collins v. Commissioner
Docket No. 2794-64.
United States Tax Court
T.C. Memo 1965-311; 1965 Tax Ct. Memo LEXIS 18; 24 T.C.M. (CCH) 1738; T.C.M. (RIA) 65311; December 2, 1965
*18 Held: Respondent, under his burden of proof, failed to establish that petitioner received taxable income in 1957 of at least $14,900. Therefore, the period of limitations provided in section 6501(e)(1)(A), 1954 Code, does not apply, and assessment and collection of an income tax deficiency for 1957 is barred by the statute of limitations prescribed in section 6501(a). John Kennedy Lynch, 907 The East Ohio Bldg., Cleveland, Ohio., for the petitioners. Gordon B. Cutler, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined a deficiency in income tax for the taxable year 1957, in the amount of $7,811. The issue is whether determination of a deficiency in income tax for 1957 is barred by the 3-year statute of limitations prescribed in section 6501(a), 1954 Code. The respondent determined that one of the petitioners realized additional income of $14,900 in 1957 and, therefore, gross income for 1957 was understated on the return by an amount which is in excess of 25 percent of the amount of gross income stated on the return, so that the 6-year period of limitations on the assessment of a deficiency for 1957 applies under section 6501(e)(1)(A). The question *20 is whether the sum of $14,900, received by Leland S. Collins in 1957, was a gift or taxable income. Findings of Fact The stipulated facts are so found, and are incorporated herein by reference. The petitioners now are residents of Venice, Florida. During 1957, they resided in Greenville, Pennsylvania, and filed their joint income tax return for the taxable year 1957 with the district director of internal revenue at Pittsburgh, Pennsylvania. Leland S. Collins is referred to herein as the petitioner. The statutory notice of deficiency was sent to the petitioners on March 27, 1964, which was more than 3 years after the return for 1957 was filed, in 1958, but was within 6 years from the time the 1957 return was filed. In 1953, the petitioner accepted employment as the general manager of Jamestown Manufacturing Company (hereinafter called Jamestown), a manufacturer of playground equipment, located in Jamestown, Pennsylvania. Petitioner became the president of Jamestown in 1956, and he was chairman of the board of directors in 1959. He resigned and retired as of February 1, 1959, because of poor health. In the latter part of 1956, petitioner had high blood pressure, glaucoma, *21 a cataract on one eye, and his general health was poor. He feared that he might lose his eyesight. In October 1957, his general health and eyesight were worse, he was under the care of a physician, and he concluded that it would be necessary to retire from all business activities as soon as possible. Petitioner and Irving Roth (now deceased) were close friends. Roth was worth several million dollars. He owned all of the stock and was president of Roth Steel Products Company; he and his son, Leonard, owned all of the stock of Roth Steel Tube Company; and Roth was the president of Roth Steel Tube and directed and controlled that corporation. Roth and petitioner, with their wives, maintained frequent social contacts, and, together, they went to lunches, dinners, and on vacation trips. Roth discussed his personal and financial interests with petitioner, and, reciprocally, petitioner discussed his problems and plans with Roth.roth knew about petitioner's health problems and anxieties. In October 1957, while having lunch, petitioner told Roth that because of his failing health and eyesight he would soon have to retire, and did not know how much longer he could work. Roth asked Collins *22 about his financial condition and whether he would have sufficient funds for his living expenses after he retired. Petitioner was in comparatively modest financial circumstances. He did not ask Roth for any financial assistance but expressed some concern about the adequacy of his financial condition for his retirement. Roth expressed the reaction that he believed he might help him. When petitioner asked what Roth meant, Roth said he believed he could let petitioner have $15,000, that he would consider that possibility, and would let petitioner know later. Petitioner understood that Roth had offered making a gift to him of $15,000. A few days later when they met for lunch, on October 18, 1957, Roth handed petitioner a check for $15,000, and urged Collins not to jeopardize his health by working any longer than necessary. Petitioner accepted the check with the understanding that it was a gift; that he was not expected to repay all or any part of the $15,000. The check was a check of Roth Steel Tube Company. Petitioner did not ask Roth why the check was not a personal check of Roth because he had learned that Roth regarded Roth Steel Tube Company as his personal firm and he knew that Roth *23 handled many personal matters through the company. No request was ever made to petitioner to repay any of the $15,000, and petitioner never made any repayment, although he could have done so if that had been expected or required. Immediately after petitioner retired in 1959, he moved to Florida. Thereafter, Roth and his wife visited petitioner and his wife in Florida, and their friendship continued up to the time of Roth's death on March 25, 1961. Neither Roth Steel Tube ever requested petitioner to repay all or any part of the $15,000. At all times, it was petitioner's understanding that Roth, personally, had made a gift of $15,000 to him to assist him in providing for himself and his wife after he retired. It has been stipulated by the parties that all transactions by the petitioner for Jamestown with Roth Steel Tube Company were carried on at arm's length. It has been stipulated, also, that petitioner was never an employee, officer, director, or stockholder of Roth Steel Tube Company. Jamestown used steel tubes and steel products in the manufacture of its products. During 1957, 1958, and 1959, and at all times material, Jamestown purchased steel tubes and steel products from *24 3 suppliers in about equal amounts of one million dollars each year. It purchased its steel materials from Toledo Steel Tube Company, Roth Steel Tube Company, in Cleveland, and a steel products firm in New Jersey. The volume of Jamestown's purchases from Roth Steel Tube were constant and about the same during 1957, 1958, and 1959. Jamestown had an employee who handled its purchases from the 3 firms of suppliers. Petitioner supervised Jamestown's purchases and, also, he made purchases of materials for Jamestown. After petitioner resigned from Jamestown as of February 1, 1959, he did not have any further connections with and he did not do any business for Jamestown. Reuben Bonda is and has been employed by Roth Steel Tube Company since it was organized in 1947. In 1957, 1958, and 1959, Bonda's duties included acting as general counsel and working on the pricing of the products sold by Roth Steel Tube, and he checked the prices to be charged Jamestown with Howard Guerin, who in the years which are material was a vice-president and the general manager of Roth Steel Tube. Guerin dealt with petitioner, as a representative of Jamestown, in many purchase transactions in 1957, 1958, and 1959, *25 up to the time petitioner resigned and retired. In all of the transactions carried on by petitioner with Guerin and other representatives of Roth Steel Tube, there were arm's length negotiations of the prices at which Roth Steel Tube sold materials to Jamestown during which petitioner attempted to arrive at the lowest prices for Jamestown. Guerin was the principal representative of Roth Steel Tube with whom petitioner dealt. Irving Roth owned 50 percent of the shares of stock of Roth Steel Tube, and Leonard Roth, his son, owned the other 50 percent of the shares of stock. However, Leonard did not take any part in the conduct of the business of Roth Steel Tube. He was 21 or 22 years old in 1957. Irving Roth exercised complete control over the management and operations of Roth Steel Tube, and he made all of the decisions relating to the policies of the company. Roth, for his own personal reasons, had a check of Roth Steel Tube issued, dated October 18, 1957, for $15,000, payable to petitioner. On the books of Roth Steel Tube, the check for $15,000 was entered as a loan to Irving Roth. An account on its books called loans receivable from Irving Roth was debited $15,000, and a cash account *26 was credited in the same amount, both entries being made under the date of October 18, 1957. A few days after Roth handed the check to petitioner, Roth told petitioner that he would like to have something to show his bookkeeper, and asked whether he could have some kind of note prepared. Petitioner discussed this request with Roth and they agreed that petitioner would have a collateral note prepared, to which petitioner would attach a certificate for 10,000 shares of stock, which had only a nominal value, in a Philippine Islands corporation, and that the note would provide that all liability of petitioner under the note was limited to the attached collateral. Petitioner had paid $90 for the 10,000 shares of stock, less than one cent per share, in Consolidated Mines, Inc., which was listed on a Manila stock exchange. Roth knew that in October 1957, the value of the stock was 3 cents per share, or $300. Petitioner had the note prepared for $15,000, payable to Roth Steel Tube, dated October 21, 1957, which he executed and handed to Roth, with the stock certificate attached. When petitioner executed the note, it was his understanding that he was not expected to pay the note. Petitioner *27 did not make any payment on the note, although he was able to do so, and was not asked to make any payment. Petitioner resigned in January 1959 from Jamestown, as of February 1. On January 3, 1959, Irving Roth returned to petitioner the note with the stock certificate attached, at which time the value of the stock was one cent per share, or $100. Petitioner kept the note for his records. On his joint return for 1959, in Schedule H, petitioner reported $15,000 which he described as "Non-taxable Gift." Roth Steel Tube keeps its books and makes its income tax returns on the basis of a fiscal year ending on April 30. It has been stipulated that under the date of April 30, 1959, entries were made on its books crediting loans receivable from Irving Roth and debiting travel expenses. On its income tax return for the fiscal year ending April 30, 1959, Roth Steel Tube took a deduction for $15,000 travel expenses, which represented the bookkeeping entries under the date of April 30, 1959, described above. The respondent investigated the return of Roth Steel Tube for its fiscal year ending April 30, 1959, after which he mailed Roth Steel Tube a letter on June 27, 1960, setting forth proposed *28 adjustments in its reported income. Roth Steel Tube, by its president, Irving Roth, submitted a protest dated July 6, 1960, which was received on July 12, 1960, by the district director of internal revenue in Cleveland, wherein Roth Steel Tube protested the proposed disallowance of the deduction of $15,000 for travel expenses. On September 28, 1960, Roth Steel Tube, by its president, Irving Roth, filed an agreement to the disallowance of the deduction of $15,000 claimed for traveling expenses. On November 7, 1960, Roth Steel Tube paid additional income tax of $7,800, plus interest, which resulted from respondent's disallowance of the claimed deduction. The respondent added $14,900 to petitioner's taxable income for 1957. His explanation in the statutory deficiency notice is that this amount represents funds received from Roth Steel Tube Company which constituted income under section 61(a) of the 1954 Internal Revenue Code. Ultimate Findings of Fact 1. Respondent has failed to prove that $14,900 constitutes taxable income of the petitioner for 1957 under section 61(a). 2. Irving Roth made a gift of at least $14,900 to petitioner in October 1957 consisting *29 of funds which he borrowed from Roth Steel Tube Company and transferred to petitioner through a check of the company, which he controlled. 3. Petitioner did not omit from his gross income for 1957 an amount properly includible therein which was in excess of 25 percent of the amount of gross income stated in the return. 4. The assessment and collection of additional income tax is barred by the 3-year period of limitations prescribed in section 6501(a) of the 1954 Code; the 6-year period of limitations provided in section 6501(e)(1)(A) is inapplicable. Opinion The statutory deficiency notice giving rise to this proceeding was not mailed to petitioner within 3 years after his joint return for 1957 was filed. Section 6501(a). It was mailed after the statutory period of 3 years but within 6 years after the return for 1957 was filed. Section 6501(e)(1)(A). The petitioner alleged in his petition that the statute of limitations bars the assessment or collection of the alleged deficiency for 1957. In the petition it is alleged, further, that Irving Roth made a gift to petitioner in October 1957 of $15,000, consisting of funds which Irving Roth had borrowed from Roth Steel Tube Company *30 which Roth allegedly controlled. The ultimate question is whether the assessment and collection of an income tax deficiency for 1957 is barred by a statute of limitations. Respondent had the burden of proving the facts required to make applicable the 6-year period of limitations provided in section 6501(e)(1)(A), namely, that the petitioner realized income in 1957 which he failed to include in his gross income for 1957 and that such income was in excess of 25 percent of the amount of gross income stated on the 1957 return. See 10 Mertens, Law of Federal Income Taxation, sec. 57.37, page 79 of Ch. 57, where it is stated, with respect to section 6501(e)(1)(A), "The Commissioner has the burden of proving that the taxpayer omitted from gross income an amount properly includible therein and that the amount so omitted was in excess of 25 percent of the gross income reported by the taxpayer in the return for the taxable year in issue." See, also, Estate of John Iverson, 27 T.C. 786, 792, affirmed 255 F. 2d 1, rehearing denied 257 F. 2d 408; certiorari denied 358 U.S. 893. It is concluded that respondent failed to prove that section 6501(e) *31 is applicable. It is held that the assessment and collection of a deficiency for 1957 is barred by the 3-year statute of limitations prescribed in section 6501(a), since respondent has not established that petitioner omitted taxable income from his gross income for 1957 and that such alleged income was in excess of 25 percent of the amount of gross income stated in the return. The difference of $100 between the $15,000 and $14,900, which has been added to petitioner's taxable income for 1957, is the value of the shares of stock in the Philippine corporation which were returned to petitioner by Irving Roth in January 1959, along with the note, the return of which freed an asset of petitioner having a value of $100, as a result of which petitioner realized income of $100 in 1959. Hotel Astoria, Inc., 42 B.T.A. 759, 763-764. In his determination that petitioner received income of $14,900 in 1957, $100 has been eliminated from the $15,000. It is petitioner's position that Irving Roth, personally and individually, made an outright gift to him of $15,000 as an act of generosity and friendship, because of sympathy for his physical condition and health problems, and to help *32 him provide for his retirement, and that this advance of funds was a matter that was strictly between Roth, individually, and petitioner. Respondent contends that Roth Steel Tube made the advance of the funds, rather than Roth, individually, and that it was a payment in consideration for petitioner's services for the past and future purchases of Jamestown from Roth Steel Tube. It was part of respondent's burden of proof to prove that the money in issue represented compensation or a bonus for services rendered or to be rendered by petitioner. Respondent called as his only witness Reuben Bonda, an executive of Roth Steel Tube Company, who is its general counsel and personnel director, who had known Irving Roth since before 1947. His testimony is not helpful to the respondent but, on the other hand, is helpful to the petitioner. Bonda was not present when Irving Roth handed petitioner the check for $15,000, and he knows nothing about that transaction. Bonda did not testify that the $15,000 was a bonus or payment to petitioner for his services or assistance at any time relative to the purchases by Jamestown from Roth Steel Tube, or that there ever was any understanding on the part of *33 Roth Steel Tube or Irving Roth with petitioner that petitioner would be paid any amount as consideration for such alleged services, or any other services. Bonda testified that he did not have anything to do with Roth Steel Tube's selling or accounting arrangements except that he often went over the pricing of goods sold to Jamestown, although he did not handle that account; and he testified that Irving Roth had told him that he (Roth) had handed a check for $15,000 to petitioner but Roth had not discussed the matter with him (Bonda) or asked for Bonda's advice. Bonda also testified that at all times, Roth was the sole manager and "policy-maker" of Roth Steel Tube; he testified, further, that Joe Rebaechle was the bookkeeper of Roth Steel Tube during the period involved here, 1957-1959. It has been stipulated by the parties that petitioner was never an employee, officer, director, or stockholder of Roth Steel Tube, that all transactions by petitioner for Jamestown with Roth Steel Tube were at arm's length, and that in his dealings for Jamestown with Roth Steel Tube, petitioner had dealt principally with the vice-president and general manager of Roth Steel Tube (Howard Guerin). Respondent *34 did not call upon Howard Guerin to testify. There is no evidence that petitioner's dealings on behalf of Jamestown with Roth Steel Tube were not at arm's length or were not negotiated by him entirely for the benefit of Jamestown, as far as possible. There is evidence that there were sound and good business reasons for Jamestown to purchase some of its materials from Roth Steel Tube, such as the following: The mill of Roth Steel Tube in Cleveland is about 60 miles from Jamestown's plant and deliveries could be made by truck to Jamestown in about 3 hours. Jamestown did not have the facilities to store a large quantity of the materials used in the manufacture of its products, and Roth Steel Tube provided Jamestown with excellent service in making deliveries. There is unrefuted evidence that Jamestown did not deal primarily with Roth Steel Tube but, rather, made its purchases in about equal amounts at all times material from 3 suppliers, of which Roth Steel Tube was one. Respondent has stipulated that petitioner's dealings for Jamestown with Roth Steel Tube were at arm's length. This is supported by such evidence as there is in this case, and there is no evidence to support respondent's *35 theory that the $15,000 was paid to petitioner as a bonus or consideration, or compensation for some sort of alleged services of petitioner to either Roth Steel Tube or Irving Roth in connection with the purchases of materials by Jamestown from Roth Steel Tube, or for any other services. Respondent failed to produce any direct or indirect evidence to establish his theory and allegation to that effect. He has not established that petitioner performed or promised to perform, directly or indirectly, any services of any kind, or that he did or agreed to do anything, for Irving Roth or Roth Steel Tube which would constitute an incentive to either Roth or Roth Steel Tube to make a payment to him in return for such services, or for some anticipated benefit. Cf., Commissioner v. Duberstein, 363 U.S. 283; and Bogardus v. Commissioner, 302 U.S. 34. Respondent has been obliged, under all of the circumstances that are present here, including the fact that Irving Roth died prior to respondent's inquiries into the whole matter, to search for some indication in all of the circumstances which might establish that the "intention" of Irving Roth, or possibly of Roth Steel Tube, *36 was to repay petitioner for some kind of services. It is necessary, therefore, to discuss the background of the "transaction" and to examine the circumstances. Respondent emphasizes that the funds were transferred under a check of Roth Steel Tube. This fact, however, does not stand alone and without explanation. Respondent has admitted under a stipulation that the bookkeeping entries which were made on the books of Roth Steel Tube in connection with the issuance of the check consisted of a debit to loans receivable from Irving Roth, along with a credit to cash; that is, on the books of the corporation the bookkeeping entries showed that the corporation loaned Roth the funds in issue, and there were no bookkeeping entries establishing an advance of funds by the corporation to petitioner. The bookkeeper of the corporation was Joe Rebaechle. The record does not show whether Rebaechle is or is not still an employee of the corporation. Respondent did not call upon him to testify. Petitioner testified that Irving Roth did not ask petitioner on October 18, 1957, when he handed him the check, to make any repayment or to execute a note, and that when Roth a few days later asked him if he *37 could have a note prepared, Roth's explanation was that he wanted something for his bookkeeper. The note which petitioner had prepared did not evidence a personal obligation of petitioner to repay $15,000 to Roth Steel Tube but limited the collectibility of the note to the attached collateral which, according to petitioner's unrefuted testimony, was known to Roth to have only a very nominal value. Irving Roth returned the note and the collateral to petitioner and no demands were ever made upon petitioner to make any payment under the note. In this case, respondent does not contend that a loan was made to petitioner by the corporation or Irving Roth. At the most, the collateral note can be regarded only as a means whereby the corporation could, if it elected to do so, sell the attached collateral for whatever it would provide, about $100. The corporation did not however, elect to collect anything, the collateral was returned to petitioner, with the note, and all that could be concluded therefrom would be that the corporation "forgave" an obligation of petitioner to pay it approximately $100. A conclusion cannot properly be made from any or all of the above circumstances that either *38 Irving Roth or Roth Steel Tube paid or intended to pay petitioner consideration for services performed or to be performed by him. There is no proof which contradicts petitioner's testimony that in 1957, and later in 1959, he did not have any knowledge whatsoever about what bookkeeping entries were made on the books of Roth Steel Tube. Eventually, on the books of Roth Steel Tube, the loan to Irving Roth of $15,000 was in effect "repaid" by him, or closed out, by a charge to travel expenses. Petitioner had no knowledge of his own about and had nothing to do with those bookkeeping entries. (After respondent's inquiries and determinations, petitioner learned of the bookkeeping entries.) The record in this case does not provide any explanation of them. Petitioner's testimony is that he understood at all times, when Irving Roth proposed to give him and gave him a check for $15,000, and, thereafter, that Roth intended the advance of funds to be a gift of Roth, personally, which was motivated by Roth's generosity, friendship, and concern about petitioner's health, and his needs after his retirement from all business activities. There is also testimony that Roth controlled Roth Steel Tube *39 in all respects. In the absence of contradictory evidence, it is not inconsistent with petitioner's understanding that Roth intended to make a gift, personally, that Roth resorted to his personal loan account on the books of his wholly controlled corporation for the funds which he, personally, presented to petitioner; and we cannot upon the record in this case find that the corporation, rather than Irving Roth, advanced the funds to petitioner, or that a gift was not intended and was not made by Irving Roth. Since respondent had the burden of proof in this case, and since he failed to establish that the funds advanced to petitioner by Irving Roth were a payment of consideration to petitioner for some kind of services rendered or to be rendered by petitioner, we are unable to find and conclude that petitioner realized income in 1957 of $14,900. It is recognized, of course, that all of the circumstances which were ascertained by the respondent were such that the transaction involving the transfer of $15,000 to petitioner was open to question and doubt. But the question which appears to this Court to be least doubtful is whether petitioner performed or agreed to perform services for *40 Irving Roth or Roth Steel Tube. The stipulation and other evidence that petitioner's dealings for Jamestown with Roth Steel Tube were at arm's length and were carried on through bona fide negotiations are opposed to respondent's theory and contentions that the funds he received were compensation for services; and there is no evidence that petitioner performed or agreed to perform services of any kind for Roth or Roth Steel Tube. Upon the whole record, the finding is made that Irving Roth made a gift to petitioner in October 1957, of $14,900. It is concluded that the determination of the respondent is barred by the 3-year period of limitations set forth in section 6501(a), and that the 6-year period of limitations provided by section 6501(e)(1)(A) does not apply. Decision will be entered for the petitioner.